## GRIFFITH *v.* MAXFIELD.

### Opinion delivered June 3, 1899.

1. DECLARATION OF TRUST—CONSTRUCTION.—The owner of land, in consideration of love and affection, made a written declaration that he held it, one-half for himself, the other half in trust for his three brothers, reserving to himself the right and power to sell and convey said land, to any person or persons at such prices as he might deem proper and advantageous to himself and beneficiaries. The three brothers accepted the terms and provisions of the trust. *Held,* that the instrument did not convey any title or interest in the land itself to the brothers, but was merely the declaration of a purpose to hold one-half of the proceeds of the land in trust for them. *Held,* also, that if the instrument were sufficient, under the statute of uses, to convey to the brothers an equitable interest in the land, the grantor, by expressly reserving a power to sell and convey, retained the authority to make conveyances of the land in his own name. (Page 520.)

2. SAME—CONSIDERATION—EVIDENCE.—Where the owner of land signed a declaration of trust, reciting that the lands declared to be held in trust "had been acquired by the said labor and investments" of the beneficiaries, his brothers, it may be shown by parol proof that there was no consideration for the instrument except love and affection. (Page 521.)

33

3. POWER—SURVIVORSHIP.—Where, in making a declaration of a trust in land, the trustee reserves to himself the power to sell and convey the land and retains an interest in the land itself, his right to execute the power will not be affected by the death of the beneficiaries. (Page 521.)

Appeal from Independence Circuit Court.

RICHARD H. POWELL, Judge.

*J. W. Butler* and *J. C. Yancey*, for appellant; *F. D. Fulkerson*, of counsel.

The complaint states simply a cause of action in debt. 6 Ark. 497; Ch. Pl. 99, 313; 110 Pa. St. 569. The court erred in transferring this case to equity on defendant's motion. Const. Ark. (1874), art. 2, § 7; Sand. & H. Dig. §§ 5608–5609; 52 Ark. 415; 56 Ark. 396; 22 Ark. 32. The court erred in postponing the case after submission, and suggesting the necessity of additional evidence. The title tendered to appellant was defective, and not such as he was compelled to accept. Waterman, Spec. Perf. § 412; 67 Pa. St. 396; 63 Ark. 551. Under the statute of uses, the "Declaration of Trust" vested the legal title to the property in appellee's three brothers. 33 Ark. 255. Appellant was entitled to a deed with the usual covenants of the vendor. 44 Ark. 152; 33 Ark. 255.

*H. S. Coleman*, for appellees.

Since it was necessary to state an account, even if appellant's contention that appellee had not executed, and could not execute, a deed be correct, a resort to equity was proper. 1 Story, Eq. Jur. § 501; 26 Wis. 588; 30 Ala. 311; 83 N. C. 406. *A bargain and sale* of the land was necessary to make the declaration of trust come within the statute of uses. 33 Ark. 255. The intention of the parties that Theo. Maxfield should retain the legal title, with full power to sell, will control the instrument, even if within the statute of uses. 33 Ark. 256; 53 Ark. 188. Theo. Maxfield held the naked legal title in trust for appellee. 16 Ark. 120; 13 Ark. 533; 14 Ark. 634; 39 Ark. 375.

*Robert Neill*, for appellees.

Equity having jurisdiction for one purpose will take jurisdiction of the whole case. 56 Ark. 396. For definition of

"Declaration of Trust" see 5 Am. & Eng. Enc. Law, 368; And. Law Dict. 320. The power to sell was not revoked by death of several of the parties interested. 2 Washb. Real Prop.663–4; 18 Am. & Eng. Enc. Law 878; 8 Wheat. 175.

WOOD, J. Appellant bought of the firm of Theo. Maxfield & Bros., composed of Theodore, Edward, Charles, and John Fred Maxfield, a certain tract of land, for which he executed his promissory note for $600, with interest at the rate of ten per cent per annum, took the bond for title of Theo. Maxfield & Bros., and went into possession under his purchase. Appellant paid the note, and was tendered a warranty deed, duly signed and acknowledged by Theodore Maxfield and his wife, which, after examination, he refused to accept. Appellant offered to surrender the possession of the land to Theodore Maxfield, which was refused, and thereupon appellant brought this suit against Theodore and Charles Maxfield as survivors of the firm of Theo. Maxfield & Bros. to recover the sum of $650, as damages for the alleged breach of the bond for title.

The principal question in the case is: Was the deed of Theodore Maxfield and wife a compliance with the stipulations of the bond for title? The bond was in the usual form, and contained the following clause: "Now, if the said Theo. Maxfield & Bros. shall make a good and sufficient title in fee simple to said W. R. Griffith, his heirs and legal representatives, to the above-described lots of lands, upon the payment of the above promissory note and the interest that shall accrue thereon, then this obligation shall be void; otherwise, to remain in full force and effect." If the deed of Theodore Maxfield and wife conveyed to Griffith "a good and sufficient title in fee simple," it fulfilled the express stipulation of the bond. Was it a good title?

Omitting unnecessary details, we will state only such facts as are required to make clear the rulings upon the objections urged in appellant's brief to the title. In 1881 Theodore Maxfield, who up to that time had acquired considerable real and personal property, gave to his three brothers, Edward, Charles W. and J. Fred, an interest in his mercantile and woolen-mill business, and entered into a partnership with them. Edward

owned "a sort of working interest" at the time of the organization of the firm; but the other brothers, Charles W. and J. Fred, had no interest whatever, and the gift of Theodore to them was purely voluntary,—in consideration of love and affection. The firm dealt only in personal property, and their business continued unchanged until the 10th of January, 1883. During these years Theodore became the owner, in his own name and right, of a large amount of real estate, consisting of 4,000 acres of farming land and 500 town lots, which, Theodore says, they estimated to be worth $100,000 at the time the declaration of trust was made, on the 10th of January, 1888. The firm had no title to, nor interest in, any of the land, except a few unimportant tracts. A separate account, under the head "Real Estate," was kept on the books of the firm, in which were entered all the purchases and sales of real estate made by Theodore. All the money which was received from either the firm's business or Theodore's real estate business was kept in one common depository, and, when Theodore took out money to pay for land, it was charged to him on his "real estate" account, and when he turned in any on the sale of the land, it was credited to him on his "real estate" account.

On January 10, 1888, Theodore, on his own motion, and without any consideration, had a declaration of trust prepared by his attorney, and it was signed by him and the other members of the firm. The provisions of this instrument, after describing the land and naming the parties, are as follows: "And whereas said parcels of land, although held in severalty by the said Theodore Maxfield as in fee simple, are in equity the property and estate of all the said above-named parties thereto, as tenants in common in the shares and proportions as follows, to-wit:   Theodore Maxfield, an undivided four-eighths ($\frac{4}{8}$); Edward Maxfield, an undivided two-eighths ($\frac{2}{8}$); Charles W. Maxfield, an undivided one-eighth ($\frac{1}{8}$) and John Fred Maxfield, an undivided one-eighth ($\frac{1}{8}$); the said lands having been acquired by the said labor and investment of all the said several parties hereto:   Now, therefore, I, the said Theodore Maxfield, in consideration of the above recited, and the sum of one dollar to me in hand paid by the said Edward Maxfield, Charles W. Maxfield and John Fred Maxfield, the receipt whereof I do hereby acknowledge, do hereby

declare and make known that I hold the above-described lands as follows, to-wit: An undivided four-eighths ($\frac{4}{8}$) in my own right, in fee; an undivided two-eighths ($\frac{2}{8}$) in trust for the above-named Edward Maxfield; in trust for the above-named Charles W. Maxfield an undivided one-eighth ($\frac{1}{8}$); in trust for the above-named John Fred Maxfield an undivided one-eighth ($\frac{1}{8}$); hereby reserving and retaining to myself the right and power to sell and convey to any person or persons any and all of the above-described lands at such price or prices, and upon such terms, as I may deem proper and advantageous to myself and co-owners, the beneficiaries. In consideration of the provisions herein above recited, and of divers other good and valuable considerations us hereunto moving, we, the said Edward Maxfield, Charles W. Maxfield and John Fred Maxfield, beneficiaries in this instrument, hereby accede to and accept the provisions and terms of this declaration of trust, and acknowledge our separate beneficial and equitable interests in the lands above described to be as above stated and set out."

The instrument is signed by all of the parties,—Theodore, Edward, Charles W. and John Fred Maxfield,—and bears date January 10th, 1888.

In 1872 Theodore Maxfield and his brother, George R. Maxfield, purchased a tract of land, of which the lot in controversy was a part, and held possession of the same as tenants in common until March 4, 1887, when George Maxfield died intestate, leaving a widow and four minor children. But they did not reside upon the lot in controversy,—same was not the homestead. The firm of Theo. Maxfield & Bro., *supra*, was the principal creditor of the estate of George R. Maxfield, deceased. Charles W. Maxfield was appointed and duly qualified as administrator of the estate of George R. The interest of George R. Maxfield in the lands, including the lot in controversy, was sold by the administrator on the 30th of September, 1887, under an order of the probate court, to pay debts. The half interest of George R. in the lands owned by him and Theodore was appraised at $1,750, and was bought by Theodore for the sum of $2,100, and on the 9th day of January, 1888, under an order from the probate court, the administrator made him a deed to the land.

1.  The first objection made by appellant to the deed of Theodore Maxfield and wife is as follows: "Because the evidence shows that Charles W. Maxfield, the administrator, was interested in the purchase of the land which he sold at his administrator's sale."

There is no such proof in the record. The facts that Charles W., the administrator, was a member of the firm of Theo. Maxfield & Bros., which held the claim against the estate of George R., which claim, among others, the land was sold to satisfy; that Theodore and John Fred were his bondsmen; that Charles W., the administrator, allowed a claim of $1,686.33 in favor of the firm, which, without proof, was probated against the estate; that the administrator procured an order, and sold the land in controversy, with other lands; that Theodore Maxfield purchased the land at said sale, and obtained deed to same, January 9, 1888, and the next day executed the deed of trust to Chas. W. and the other brothers of this same land, declaring it "had been acquired by the said labor and investment of all the said several parties" thereto,—none of these facts, in our opinion, prove that Charles W. was interested in the purchase of the land at the sale by him as administrator. The land was purchased by Theodore Maxfield, not by Charles W. The evidence on this point by Theodore Maxfield is as follows:

"Q.  When this half interest in what was known as the 'McGruder place' was to be sold by the administrator, I will ask if you and the administrator had any understanding between you that you were to buy the land?

"A.  There was not.

"Q.  Was there any understanding that you were to buy in the land for the firm of Theodore Maxfield & Bros.?

"A.  There was not. On the other hand, I expected to sell my interest.

"Q.  State, if at the sale you made any public declaration to the bystanders about this land.

"A.  I stated at the court house door, when the property was sold, that my half interest in the property would be for sale at the same price that my brother George's interest brought,—that any one wanting to purchase it could have my interest in it for

the same price as the half interest that was being offered for sale. * * * *

"Q.  State why you bid more than the appraised value of the land.

"A.  I wanted to sell, and, in the first place, offered my interest for sale.  I wanted to sell my interest, and not to buy. * * * * *  I was interested, not only for myself, but for my brother's widow, to have the property bring as much as it would.  I did not calculate to take it.  I bid $2,100, and there were no further bids, and it dropped on me.

"Q.  State if the firm of Theodore Maxfield & Bros. was interested in any way in the purchase of that land.

"A.  No, sir.  They were not.  I had owned one-half interest for twelve or fifteen years, and, when this was sold, I bought it for my own use and benefit, and the firm had no interest in it whatever.

The testimony of Charles Maxfield was to the same effect, and, without setting it out in *haec verba*, it shows, of the proceeds of the sale by him as administrator, he had "close to the sum of $1,000," after paying the debts, which sum he paid to the widow and heirs of George R. Maxfield.  This witness shows how the amounts were paid, and explains the entries made on the book of Theodore Maxfield & Bros., which it would too greatly encumber this record to set out at length; but we think, in the light of his evidence, it is clear that there is no inconsistency between his testimony and the book entries as to how the amount was paid for which George R. Maxfield's half interest was sold.  But, if there were, the cogent fact remains, and it is undisputed, that the land was sold, purchased by Theodore Maxfield, paid for by him, and the money paid over by the administrator to the proper parties.

Charles Maxfield says:  "When I made the deed, he (Theodore) settled up and paid me.  It was charged to Theodore's account.  By charging it to Theodore's account, that authorized me to settle with the widow.  The amount was going to the firm after it was charged to Theodore.  After paying the account, the balance was paid to the widow in cash.  The children were paid a hundred dollars each, and the widow got the other five hundred.  The widow really was paid all of

it. After paying the debts, the balance in my hands was $890, which I paid to the widow, and took her receipt for it."

It is not pretended that the account of the firm of Theodore Maxfield & Bros. against the estate of George R. was simulated or fraudulent. The allowance of the account by the administrator and probate court without proof was merely error, which might have been corrected by appeal from such allowance. It did not in any manner affect the regularity and validity of the sale made by the administrator to pay debts under the order of the probate court. Nor does any or all of the above facts tend in the remotest to show that the administrator was interested in the purchase. The most that it could be said to show would be that the administrator, being a member of the firm holding the account against the estate, was therefore interested in the proceeds for which the lands sold, to the extent of his interest in the debt due the firm; but that would in no way make him a party to the purchase of the land, in the sense condemned by the law. Had the proof showed that the land was paid for by the firm, and that the amount withdrawn from the firm had not been charged up to Theodore Maxfield, then there would be something in the contention that Charles W. Maxfield was interested in the purchase at his own sale as administrator. As we gather from the record, the proof is the other way. There is no defect in the title of Theodore Maxfield growing out of any fatal defect or irregularity connected with the administrator's sale, at which he purchased.

2. It is next contended that, "by the deed styled 'a declaration of trust,' the three brothers became seized of the equitable estate of a one-half undivided interest in said land." This contention, of course, concedes (we suppose, for the sake of argument) the correctness of the conclusion we have just reached *supra*, that Theodore Maxfield acquired title to a half interest of the land in controversy through the sale of and deed by the administrator of the estate of George R. Maxfield under the order of the probate court. Did Charles W., Edward and John Fred acquire an equitable title in the property, which Theodore could not convey by the deed? The instrument itself furnishes an irrefutable negative answer. The error into which counsel for appellants fall is in calling the declaration of

trust a "deed," and in supposing that it has the force and legal effect of a deed in conveying title to real estate. Neither the words "bargain and sell" in the present tense, nor any words of similar import, indicating a present purpose to convey any interest or title in the land itself, are used. There is no grantor and grantee. In *Holland* v. *Rogers*, 33 Ark. 255, the court uses this language: "A simple bargain and sale of land, in writing, in words of the present and without any more, is a conveyance, operating under and by virtue of the statute of uses, always upon sufficient consideration. It was devised in England as a common assurance soon after the passage of the statute, and has become the most common mode of conveyance in the United States. It is more than a quit-claim or a release. It actively effects a divestiture of title from the grantor, and transmits it to the grantee, with or without covenants of warranty."

We do not think the language of the instrument, under the statute of uses, could be construed as operating to convey any title or interest in the land itself to the brothers of Theodore Maxfield. It is merely the declaration of a purpose to hold the land himself, or to convey it and hold the proceeds in trust for them. It simply means that whatever use it may be subjected to by him in the way of rental or otherwise, or by sale, they shall share with him in the proceeds thereof, in the proportion designated in the declaration. See *McCulloch* v. *Chatfield*, 15 U S. A. 48.

This view is strengthened by the extraneous, uncontradicted proof that there was no consideration for the instrument, except love and affection. The recital that the lands "had been acquired by the said labor and investments of all the said several parties" pertained to the consideration for the instrument, and oral proof on this point was proper. A declaration of trust or use is an act by which a person acknowledges that a property, the title to which he holds, is held by him for the use of another. Anderson's Law Dict. 320.

But if we concede that the instrument, under the statute of uses, was sufficient to convey from Theodore Maxfield an equitable interest in the land to the brothers named, in the propor-

tion designated, then, by the terms of the same instrument, has not Theodore Maxfield reserved to himself "the right and power to sell and convey to any person or persons any and all of the above-described lands at such price or prices, and upon such terms, as I (he) may deem proper and advantageous to myself (himself) and co-owners, the beneficiaries?" And do not the beneficiaries accede to and accept the terms and provisions of the declaration of trust, and acknowledge their separate beneficial and equitable interest in the lands described *to be as therein stated and set out?* The power which Theodore Maxfield reserved to himself was a power coupled with an interest in the land, and it was not revoked by the death of Edward or John Fred Maxfield. Nor did the failure of Charles W. to join in the deed make it any the less effectual to convey a perfect title. Mr. Wharton defines a power as "an authority retained by or conferred upon a person to deal with property so as to affect, more or less, estates or interests therein possessed, either by himself or by others, albeit underived therefrom." 18 Am. & Eng. Enc. Law, 878. "Where the right or authority to do the act is connected with or flows from an interest in the subject on which the power is to be exercised, the power is said to be coupled with an interest; but, where it is disconnected from any interest of the donee in the subject-matter, it is a naked power." 18 Am. & Eng. Enc. Law, 887. If a power be coupled with an interest, it survives the person giving it, and may be executed after his death. *Hunt* v. *Rousmanier's Admrs.*, 8 Wheat. 174.

It follows from what we have said that the deed of Theodore Maxfield and wife, tendered to appellant, conveyed a perfect title, and was a full compliance with the condition of the bond for title.

3. The court did not err in postponing the case and allowing testimony to be taken. This was a matter purely in the discretion of the court, and the testimony was relevant and proper.

4. The appellant has no cause of action. The questions raised, the evidence being uncontradicted, were those of law. It would be folly to remand the cause for trial at law, even if

the court erred in transferring it to the equity docket,. for the error was not prejudicial. The judgment could not have been otherwise.

Let the judgment be affirmed.